04cv18948a-ord(SJ-Motions).wpd

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY TAMRAZ, et al., | : | |
| | : | **Case No. 1:04-CV-18948** |
| **Plaintiffs,** | : | |
| | : | **JUDGE O'MALLEY** |
| v. | : | |
| | : | **MEMORANDUM AND ORDER** |
| LINCOLN ELECTRIC CO., et al., | : | |
| | : | |
| **Defendants** | : | |

This case has been consolidated with the Multidistrict Litigation known as *In re: Welding Fume Prod. Liab. Litig.*, case no. 03-CV-17000, MDL no. 1535.  Previously, the undersigned has issued a large number of rulings while presiding over: (1) the centralized proceedings; (2) two trials of other, individual welding fume cases; and (3) four other, individual cases that were set for trial but ultimately were not tried.[1]  During the course of those rulings, the Court has set out in detail the general background of this MDL, the undisputed facts applicable to this case, and relevant case law.

---

[1]  The first trial was in *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363, which involved claims made under Texas law.  The second trial included two consolidated cases, *Goforth v. Lincoln Elec. Co.*, case no. 06-CV-17217, and *Quinn v. Lincoln Elec. Co.*, case no. 06-CV-17218, which involved claims made under South Carolina law.   The four other cases that were set for trial but were not tried were: *Ruth v. A.O. Smith Corp.*, case no. 04-CV-18912, which settled on the eve of trial; *Landry v. Nichols Wire*, case no. 03-CV-17016, which was voluntarily dismissed early in discovery; and *Morgan v. Lincoln Elec. Co.*, case no. 04-CV-17251, and *Peabody v. Lincoln Elec. Co.*, case no. 05-CV-17678, both of which were voluntarily dismissed shortly before trial.

The Court expressly incorporates those rulings by reference, and so does not repeat itself here.[2]

As for this case, plaintiff Jeffrey Tamraz brings this action against defendants Lincoln Electric Company, Hobart Brothers Company, BOC Group, Inc., ESAB Group, Inc., and TDY Industries, Inc.[3] The five defendants are all manufacturers of welding rods that Tamraz asserts he used during his career as a welder in California.  Tamraz alleges the fumes given off by these welding rods caused him to suffer neurological injury.  In his second amended complaint, Tamraz brings claims for: (1) strict liability – design and marketing defect; (2) negligence; (3) common law fraud – failure to disclose; (4) negligent sale of a product; (5) breach of warranty; (6) loss of consortium; (7) punitive damages; (8) aiding and abetting the tortious failure to warn; (9) aiding and abetting the tortious failure to investigate the hazards of welding fumes; and (10) negligent performance of a voluntary undertaking.  The parties agree that Tamraz's claims all arise under California law.

Defendants now move for summary judgment on a number of Tamraz's claims.  For the reasons stated below, the Court rules on these motions as follows:

---

[2] In addition to incorporating by reference all rulings contained in the Orders and hearings cited in the remainder of this opinion, the Court also incorporates by reference the following Orders: *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 3226951 (N.D. Ohio Oct. 30, 2007) (granting summary judgment to defendant Caterpillar in all MDL cases); *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605 (N.D. Ohio April 9, 2007) (granting summary judgment to defendant Metropolitan Life Insurance Company in all MDL cases); and *Ruth v. A.O. Smith Corp.*, 2005 WL 2978694 (N.D. Ohio Oct. 11, 2005) (granting summary judgment on a conspiracy claim).  Should any party later wish to appeal this Order, the Court makes clear here that the other rulings so incorporated must be included as an addendum to this Order and made a part of the appellate record.

[3] Jeffrey is joined as a plaintiff by his wife, Terry Tamraz, who brings a claim for loss of consortium.  For simplicity, the Court refers in this opinion to Jeffrey as "Tamraz," as though he is the sole plaintiff.  The second amended complaint also listed Deloro Stellite Company and Thermadyne Holdings Corp. as defendants, but Tamraz has voluntarily dismissed them.

- Defendants' motion for summary judgment on Tamraz's claim for breach of warranty (docket no. 51) is **GRANTED**.

- Defendants' motion for summary judgment on Tamraz's claim for punitive damages (docket no. 50) is **DENIED**.

- Defendants' motion for summary judgment on Tamraz's strict liability design defect claims (docket no. 52) is **GRANTED**.

- Defendants' motion for summary judgment on counts eight and nine (docket no. 53) is **GRANTED**.

- Defendants' motion for judgment on the pleadings on claims for common law fraud (docket no. 31) is **DENIED**.

- Defendants' motion for summary judgment on Tamraz's claim for negligent performance of a voluntary undertaking (docket no. 54) is **GRANTED**.

The Court discusses each of these motions, below.


## I.    Claim for Breach of Warranty.

At count five of his complaint, Tamraz asserts a claim for breach of warranty.  The

allegations underlying this claim are as follows:

> 117.    At all relevant times, Defendant Manufacturers of Welding Consumables expressly warranted in words and substance that welding products were generally safe.  However, at such time Defendant Manufacturers of Welding Consumables knew that contrary to their warranty welding products were not generally safe and in fact were dangerous and that the manganese contained in welding fumes caused neurological injury.

> 118.    Plaintiff Jeffrey A. Tamraz relied upon Defendant Manufacturers' of Welding Consumables warranties to his detriment.

Second amended complaint at 28.

In support of his allegation that the defendants "expressly warranted in words and substance

that welding products were generally safe," Tamraz points to two sources of communication from

3

the defendants: (1) the warning labels that came with the welding rods he used; and (2) various industry publications, such as welding literature written and disseminated by defendants.  Tamraz asserts the defendants "manipulated the information on warning labels and in industry publications to significantly downplay the hazards caused by manganese in welding fumes."  Response at 2.  One example Tamraz recites is a 1971 welding handbook published by Lincoln Electric, which stated: "Much research has been done which has proven that the fumes and smoke obtained when welding steel and ferrous alloys are not harmful.  In addition, the experience of years has shown that this is true."[4]

In their motion for summary judgment, the defendants argue Tamraz's breach of warranty claim fails as a matter of law because none of the sources of communication from defendants to Tamraz, upon which Tamraz predicates his claim, qualify as "express warranties."  The Court disagrees: although the statements contained in the welding rod warning labels do not qualify as express warranties, a jury could reasonably conclude that some of the statements in the industry publications do qualify.

Under California law, a claim for breach of express warranty by a seller must be based on

---

[4]  Lincoln Electric, *Procedure Handbook of Arc Welding,*" at I-27 (11th ed., reprinted in 1971).  Lincoln Electric had been making the same statement in earlier editions of the Handbook since at least 1955.

At about the same time that Lincoln Electric published this handbook, the American Welding Society ("AWS") – to which Lincoln belonged – had commissioned and received from the Battelle Memorial Institute a publication titled "Survey of Welding Fumes and Gases."  The Survey stated that "The fumes from manganese are highly toxic, and they can produce total disablement even after exposures as short as a few months to high-fume concentrations . . . .  Exposure to manganese dioxide may cause a neurological lesion involving the basal ganglia, the frontal cortex, and occasionally the pyramidal system.  Symptoms are similar to Parkinson's syndrome and include 'weakness of the legs,' difficulty in walking downhill, instability, and weakness while doing heavy work."  Battelle Survey at 27.

an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Cal. Com. Code § 2313(1)(a).[5]  In "the absence of any affirmations of fact or promises made by defendants to plaintiff, plaintiff cannot recover damages under his theory of breach of express warranty."  *Pisano v. Am. Leasing*, 146 Cal. App. 3d 194, 197-98 (1983).  "[S]tatements made by a manufacturer or retailer in an advertising brochure which is disseminated to the consuming public in order to induce sales can create express warranties."  *Keith v. Buchanan*, 173 Cal. App.3d 13, 22 (1985).  But the *lack* of a statement, such as the failure to include a specific warning about a product, is not an express warranty.  *See Coleman Cable Systems, Inc. v. Shell Oil Co.*, 1997 WL 579116 at *3 (7th Cir. Sept. 17, 1997) ("Coleman's express warranty claim hinges not on whether there was a warning, but on whether there was an express warranty in the first place").  If a product's label warns of certain hazards, the failure of that label to warn of other hazards is not tantamount to an affirmation that those other hazards do not exist.  *Id.*

In this case, the welding rod warning labels stated, in pertinent part: "Caution.  Welding may produce fumes and gases hazardous to health.  Avoid breathing these fumes and gases.  Use adequate ventilation."  Tamraz asserts the defendants' "affirmation via the warning labels that adequate ventilation would be sufficient to protect welders is patently false and constitutes a breach of warranty."  Response at 5.  But the defendants do not make the affirmative statement that Tamraz describes.  The cautionary language "use adequate ventilation" is not an affirmation of fact, nor a promise that welders using a certain level of ventilation will *not* suffer injury; it is only an

---

[5]  "California Uniform Commercial Code section 2313, regarding express warranties, was enacted in 1963 and consists of the official text of Uniform Commercial Code section 2-313 without change."  *Keith v. Buchanan*, 173 Cal. App.3d 13, 20 (1985).

instruction that "adequate ventilation" is necessary to avoid injury. Indeed, even if the manufacturers made an "affirmation via the warning labels that adequate ventilation would be sufficient to protect welders", as Tamraz asserts, this affirmation would not be "patently false," it would be a tautology – by definition, if the ventilation is "adequate," it will protect welders (although it may require extraordinary mechanisms to achieve "adequate" ventilation in certain circumstances). Thus, Tamraz may not rely on any alleged failure of a warning label, or lack of warning statement, to support his claim for breach of warranty.

On the other hand, at least some of the industry publications identified by Tamraz do qualify as an "affirmation of fact or promise made by the seller to the buyer which relates to the goods." Cal. Com. Code §2313(1)(a). Lincoln Electric's Handbook, for example, offers an explicit description of one of the characteristics of the welding rods it supplied to Tamraz: "the fumes and smoke obtained when welding steel and ferrous alloys are not harmful." This language surely qualifies as a "specific and unequivocal written statement" related to the quality of the welding rods.

*Maneely v. General Motors Corp.*, 108 F.3d 1176, 1181 ( 9th Cir. 1997).[6]

For a different reason, however, the Court concludes that defendants are entitled to summary judgment on Tamraz's claim for breach of express warranty.  Although at least some defendants did make affirmations of fact or promises that could qualify as a "warranty," to succeed on a claim of breach of express warranty a plaintiff must show that the affirmations or promises became "part of the basis of the bargain."  *See* Cal. Com. Code §2313(1)(a).  As the *Keith* court explained, "the buyer's demonstration of reliance on an express warranty is 'not a prerequisite for breach of warranty, as long as the express warranty involved became part of the bargain. * * * If, however, the resulting bargain does not rest at all on the representations of the seller, those representations cannot be considered as becoming any part of the 'basis of the bargain.'"  *Keith*, 173 Cal. App.3d at 22-25 (citations omitted); *see also Cipollone v. Liggett Group, Inc.*, 683 F. Supp. 1487, 1498-99 (N.J. 1988) (defendants made historical affirmative statements, but there existed no evidence

---

[6]  Another example of an affirmative statement that might qualify as an express warranty occurred when Marvin Kennebeck, a member of the AWS Safety & Health Committee, wrote an article stating that a "recent study of safety and health literature has turned up no major hazards relating to welding."  Marvin Kennebeck, *Safety – What We Don't Know Is Hurting Us*, Welding Design Magazine 44 (Nov. 1979).  The article also stated: "Much research has been done which has proven that the fumes and smoke obtained when welding steel and ferrous alloys are not harmful.  In addition, the experience of years has shown that this is true."  *Id.*  Although AWS minutes suggest various defendants authorized or ratified Kennebeck's article, it is not clear whether this statement can be attributed to any particular defendant.

Still other publications by defendants, upon which plaintiffs rely to support their breach of warranty claim, do not contain affirmations; rather, like plaintiffs' warnings, they are allegedly false because they *lack* complete statements regarding the hazards of welding fumes.  *See, e.g.,* AWS Safety & Health Fact Sheet No. 24, "*Fluxes for Arc Welding and Brazing: Safe Handling and Use*" (2002) (stating that "[p]rolonged exposure to manganese oxides may affect the central nervous system, causing tiredness, fatigue, sleepiness, muscular weakness, emotional disturbances, and uncontrolled movements while walking (muscle spasms)," but not stating that, for example, manganese fume exposure can produce total disablement even after exposures as short as a few months to high fume concentrations).

7

showing these affirmations were a "basis of the bargain," so the breach of warranty claim failed as a matter of law).

In this case, no reasonable jury could conclude that any of the "affirmation[s] of fact or promises made by the seller to the buyer which relates to the goods" were "part of the basis of the bargain." Tamraz points to no evidence (and the Court's own review of the record has not revealed any) suggesting that Tamraz ever even *saw* the industry publications at issue, much less that the affirmations they contained became a part of the basis of any bargain between Tamraz and the manufacturing defendants.[7] Tamraz does not claim that these representations induced him to begin his career in welding, or to continue down that path, or to use or not use any specific product, or to take any particular level of care when welding. Without this evidentiary link, Tamraz cannot prove an essential element of his claim for breach of express warranty. Accordingly, defendants are entitled to summary judgment on this claim.

## II.     Claim for Punitive Damages.

In the other *Welding Fume* cases that were set for trial, the defendants also moved for summary judgment on plaintiffs' claims for punitive damages. The Court denied those motions. *See, e.g., Ruth v. A.O. Smith Corp.*, 2006 WL 530388 at *3 (N.D. Ohio Feb 27, 2006); *Solis*, docket no. 146 and hearing tr. at 179 (May 16, 2006); *Goforth*, docket no. 102 and hearing tr. at 121-23 (Oct. 25, 2006). This was true even though the different state-law standards for punitive damages applicable in these cases varied somewhat.

---

[7]  *See, e.g.*, Tamraz depo. at 244 (Aug. 14, 2007) (Tamraz did not recall whether he ever received the AWS welding journal).

8

For the reasons stated in those prior rulings, the Court again concludes that the defendants' motion for summary judgment on Tamraz's claim for punitive damages must be denied.  As noted in those other cases, however, this denial "is without prejudice, meaning defendants may later move for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50, on [Tamraz's] claim for punitive damages." *Ruth*, 2006 WL 530388 at *3.[8]

### III.    Claim for Strict Liability Based on Design Defect.

At count one of his complaint, Tamraz brings a claim for strict product liability based on both: (a) defective design, and (b) defective warnings.  Defendants do not seek summary judgment on the latter claim, but do on the former.

Regarding the former, Tamraz asserts two types of product design defects: (1) "Defendants have failed to maintain the lowest feasible manganese levels in their products and in the fumes they generate"; and (2) "flux-cored welding electrodes should not have been sold without a fume extraction device."  Response br. at 3, 6.  The defendants assert that Tamraz cannot prevail on either aspect of his design defect claim, for a number of reasons.  The Court does not examine all of the defendants' arguments, but finds one persuasive: Tamraz does not offer any expert testimony, which is necessary to prove his design defect claim.

_____

[8]  The Court further notes that the argument defendants assert most strongly is that "a manufacturer cannot be liable as a matter of law for punitive damages if it provides warnings about possible hazards associated with the use of its products."  Motion for summary judgment at 1. Defendants insist, essentially, that because they provided *some* warning, they cannot be liable for punitive damages as a matter of law, even if the jury determines that the warning they did provide was inadequate.  The Court observes, however, that California courts have allowed imposition of punitive damages against tobacco companies, despite the warnings provided on their product. *Henley v. Philip Morris Inc.*, 9 Cal.Rptr.3d 29 (Cal. Ct. App. 2004).

In California, there are "two tests for proving design defect" – the "consumer expectation test" and the "risk-benefit test." *McCabe v. American Honda Motor Co.*, 123 Cal. Rptr. 2d 303, 309-10 (Cal. Ct. App. 2002). The consumer expectation test "permits a plaintiff to prove design defect by demonstrating that 'the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.'" *Id.* at 309 (citation omitted) (quoting *Barker v. Lull Engineering Co.* 573 P.2d 443, 455 (Cal. 1978)). A court should instruct a jury on the consumer expectation test only in "cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design*." *Soule v. General Motors Corp.*, 882 P.2d 298, 308 (Cal. 1994) (emphasis in original). Generally, expert testimony is neither required nor allowed in cases where the consumer expectation test is invoked, because use of an expert "to demonstrate what an ordinary consumer would or should expect . . . would invade the jury's function." *Id.*

In contrast, in cases "where plaintiff's theory of defect seeks to examine the behavior of 'obscure components under complex circumstances' outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit analysis." *McCabe*, 123 Cal. Rptr. 2d at 311. Under the risk-benefit test, a product may be defective if "the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." *Barker*, 573 P.2d at 454. When evaluating the adequacy of a product's design under the risk-benefit test, the jury may consider, "among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the

mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Id.* at 455.  Critically, because these factors are "outside the ordinary experience of the consumer," expert testimony is necessary.  *See Lester v. Barbosa Cabinets, Inc.*, 2006 WL 3365644 (Cal. Ct. App. 2006) ("In a design defect case involving the risk-benefit analysis . . . , the jury necessarily relies heavily on the testimony of experts.").

The parties in this case agree that the test applicable to Tamraz's design defect claims is the risk-benefit test.[9]  This means that, to prove his claim, Tamraz must offer expert testimony regarding, for example, the degree of danger posed by a flux-cored arc-welding gun that does not have an integrated fume extractor, the mechanical feasibility and financial cost of adding a fume extractor to a welding gun, and the consequences to the gun and the welder and his employer that would result from adding a fume extractor.[10]  As defendants point out, however, Tamraz does not

---

[9]  Defendants' motion at 3 ("In order to prevail on a theory of design defect, it must be shown that '. . . the risk of inherent danger in the challenged design outweighs the benefits of such design") (quoting *Barker*); plaintiff's response at 8 ("Plaintiff directs the Court to the second test which is rooted in a risk-benefit analysis.").

[10]  Actually, "[t]o prove a defect under this test, a plaintiff need only demonstrate that the design proximately caused the injuries.  Once proximate cause is demonstrated, the burden shifts to the defendant to establish that the benefits of the challenged design, when balanced against such factors as the feasibility and cost of alternative designs, outweigh its inherent risk of harm." *McCabe*, 123 Cal. Rptr. 2d at 310.  That the burden of proof shifts to defendants, however, does not change the fact that both plaintiffs and defendants will virtually always present expert testimony going to the risks and benefits of the product's design.

Defendants in this case do argue that Tamraz cannot even show proximate cause – for example, he cannot show that the absence of a fume extraction device on the flux-cored welding guns he used proximately caused him any harm, because he only welded with flux-cored wire infrequently, and he does not know which defendants' flux-cored products he used.  Because it is not necessary to reach this argument to resolve defendants' motion, however, the Court does not do so.

offer any expert opinion going to these issues.

Because Tamraz cannot adduce expert evidence at trial showing the design of the welding products at issue embodied "excessive preventable danger," defendants are entitled to summary judgment on his claim for strict product liability based on defective design.

**IV.      Claims for Aiding and Abetting, and Acting in Concert.**

At count eight of his complaint, Tamraz asserts a claim for aiding and abetting, and also acting in concert – both of which are legal theories set out in the Restatement (Second) of Torts §876(b).  Specifically, Tamraz alleges that "each and every Defendant Manufacturer of Welding Consumables, both individually and collectively, aided and abetted one another in tortiously failing to warn [him] and his employers of the health hazards of exposure to manganese in welding fumes under Restatement (Second) of Torts §876(b)."[11]  Tamraz also alleges that the same defendants "acted in concert in tortiously failing to warn [him] and his employers of the adverse health effects of exposure to manganese in welding fumes.   The common plan or design of Defendant Manufacturers was to tortiously fail to warn [Tamraz] and other welders that manganese in welding fumes could cause neurological injury under Restatement (Second) of Torts § 876(a)."[12]  At count nine, Tamraz repeats both theories of liability, but identifies the tortious act as a "*failure to investigate* the welding consumables and machines the Plaintiff used for any adverse health hazards

---

[11]  Second amended complaint at ¶126.

[12]  *Id.* ¶126.

12

of exposure to manganese in welding fumes," instead of failing to warn.[13]

The two theories of liability Tamraz cites in counts eight and nine (acting in concert, and aiding and abetting) both derive from §876 in the Restatement (Second) of Torts. Specifically, §876(**a**) is the source of his claims for acting in concert, while §876(**b**) is the source of his claims for aiding and abetting:

> §876.  *Persons Acting In Concert.*
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a)      does a tortious act in concert with the other or pursuant to a common design with him, or
> (b)      knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself,
> * * *

4 *Restatement (Second) of Torts* §876 (1977).

Section 876(b) of the Restatement stands for the proposition that "Defendant A" may be liable if it: (1) knows that "Defendant B's" conduct constitutes a breach of duty to the plaintiff, and (2) substantially assists or encourages "Defendant B" to breach that duty. Tamraz asserts that each of the manufacturing defendants aided and abetted all of the other ones, because each of them: (1) breached a duty to fully warn Tamraz of the dangers of welding fumes, and to investigate the hazards associated with their products; and (2) assisted or encouraged each other to (a) use "industry

---

[13]  *Id.* ¶¶163-64 (emphasis added).  It is questionable whether count nine – the gist of which is that the manufacturing defendants failed to adequately investigate or test the welding rods they manufactured, to determine whether there existed any adverse health hazards (and aided and abetted each other in this failure) – states a claim that is *separate and in addition to* the failure-to-warn claim stated in count eight.  *See Goforth v. Lincoln Elec. Co.*, case no. 06-CV-17217, docket no. 130 at 26 (Jury Instructions) ("In determining whether a warning is adequate, you must also keep in mind that, implicit in the duty to warn, is an obligation on the manufacturer to keep abreast of scientific knowledge and advances related to its products, and to provide an adequate warning of dangers that were known or should have been known, based on the latest knowledge and available information.").

standard" warnings that they knew were inadequate, and (b) fail to undertake scientific and medical investigations of the extent to which welding fumes could cause neurological injury.  Ultimately, Tamraz asserts that each manufacturing defendant aided and abetted all of the others to *fail to warn* and *fail to investigate*.

Similarly, section 876(a) of the Restatement stands for the proposition that Defendant A may be liable if it engages in a tortious act: (1) "in concert with" Defendant B, or (2) "pursuant to a common design" with Defendant B.  The Restatement explains that "[p]arties are acting in concert when they act in accordance with *an agreement to cooperate* in a particular line of conduct or to accomplish a particular result."[14]  Again, Tamraz asserts that each of the manufacturing defendants acted in concert with all of the other ones, and pursued a common design, because each of them agreed to use "industry standard" warnings that they knew were inadequate, kept mum about the full extent of the hazards of welding fumes, and failed to investigate the extent to which welding fumes could cause neurological injury.  As with his aiding and abetting theory, Tamraz asserts that each manufacturing defendant acted in concert with all of the others, and pursued a common design,  to *fail to warn* and *fail to investigate*.

The California Supreme Court, however, has explicitly frowned upon use of any of the legal theories set out in §876 in the product liability context, where the plaintiff premises his claims on

---

[14]  4 *Restatement (Second) of Torts* §876, comment a (1977) (emphasis added).  And "[t]he same rule is applicable, in general, to tortious acts done pursuant to a common design or plan for cooperation in a tortious line of conduct or to accomplish a tortious end."  *Id.* §876 comment b. Ultimately, the theory of liability set out under §876(a) is closely related to the theory of conspiracy. The Restatement explains that "it is in connection with" actions "done pursuant to a common design or plan for cooperation" that "the word 'conspiracy' is often used."  *Id.*

a failure to warn and failure to investigate.  In *Sindell v. Abbot Labs.*, 607 P.2d 924 (Cal. 1980), the

plaintiff took a drug known as DES to prevent miscarriage.  DES was later taken off the market,

because it was linked to an aggressive form of cancer in the daughters of the pregnant women who

took it.  Similar to the claims made by *Tamraz*, the plaintiff in *Sindell* alleged that the DES

manufacturers knew of the danger posed by their product, failed to provide adequate warnings, and

failed to investigate the full extent of the hazard:

> [Plaintiff alleges that, during] the period defendants marketed DES, they
> knew or should have known that it was a carcinogenic substance, that there was a
> grave danger after varying periods of latency it would cause cancerous and
> precancerous growths in the daughters of the mothers who took it, and that it was
> ineffective to prevent miscarriage.  Nevertheless, defendants continued to advertise
> and market the drug as a miscarriage preventative.  They ***failed to test*** DES for
> efficacy and safety; the tests performed by others, upon which they relied, indicated
> that it was not safe or effective.  In violation of the authorization of the Food and
> Drug Administration, defendants marketed DES on an unlimited basis rather than as
> an experimental drug, and they ***failed to warn*** of its potential danger.

*Id.* at 925-26 (emphasis added).  And, similar to Tamraz, the *Sindell* plaintiff asserted that the

several DES manufacturer defendants aided and abetted each others' failure of action, and pursued

a common design of failing to test or warn:

> [Plaintiff] alleges that defendants' wrongful conduct "is the result of planned and
> concerted action, express and implied agreements, collaboration in, reliance upon,
> acquiescence in and ratification, exploitation and adoption of each other's testing,
> marketing methods, lack of warnings . . . and other acts or omissions . . ." and that
> "acting individually and in concert, (defendants) promoted, approved, authorized,
> acquiesced in, and reaped profits from sales" of DES.  These allegations, plaintiff
> claims, state a "tacit understanding" among defendants to commit a tortious act
> against her.

*Id.* at 604-05.

The California Supreme Court rejected the *Sindell* plaintiff's attempt to impose liability

under any theory set out in §876.  The court first noted that other cases finding §876 liability were

all distinguishable on their facts: "They involve conduct by a small number of individuals whose actions resulted in a tort against a single plaintiff, usually over a short span of time, and the defendant held liable was either a direct participant in the acts which caused damage, or encouraged and assisted the person who directly caused the injuries by participating in a joint activity." *Id.* at 605-06 (footnotes and citations omitted).  And, the court also observed that "it seems dubious whether liability on the concert of action theory can be predicated upon substantial assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding to fail to perform an act." *Id.* at 606.[15]  In contrast to *Sindell*, plaintiffs have not cited any case, from any jurisdiction, where a court allowed a §876 claim to proceed based on failure to warn or test in a product liability context.[16]

---

[15]  *See also Chavers v. Gatke Corp.*, 107 Cal.App.4th 606, 615-18  (Cal. Ct. App. 2003) (affirming trial court's refusal to give jury instructions regarding §876 theories of liability in an asbestos case).

[16]  Although plaintiffs do not cite it, the Court has reviewed *Henley v. Philip Morris Inc.*, 9 Cal.Rptr.3d 29 (Cal. Ct. App. 2004).  The *Henley* court stated:

> The jury could properly find that commencing no later than 1953 and continuing at least until the time of plaintiff's diagnosis, defendant and other cigarette manufacturers acted *both in concert and individually* to issue innumerable false denials and assurances concerning the dangers of smoking, deliberately fostering a false impression by the public, or more precisely by smokers and prospective smokers, that assertions of health risk were overblown products of puritanical prejudice, that any real hazards had yet to be shown, and that the industry itself was acting and would act diligently to discover the scientific truth of the matter and promptly disclose its findings, good or bad.  The jury could also find that plaintiff heard of these false assurances and denials, if only indirectly, and was falsely led to believe, as defendant intended, that there was a legitimate "controversy" about whether cigarettes actually caused cancer or carried any other serious health risks.

*Id.* at 62 (emphasis added).  Thus, *Henley* suggests it is not true that a §876 theory of liability can *never* succeed in a product liability context; and *Sindell* is careful not to go that far.  But the scope of positive misrepresentations and false assurances by the tobacco industry defendants in *Henley* makes the case distinguishable from this one, which is premised solely on a failure to warn or test.

16

The *Sindell* court's rejection of the §876 theories of liability in the product liability context apply equally to Tamraz's case.  Tamraz claims that the defendants aided and abetted each other, and acted in concert, in their *failure to warn and failure to test*.  But these actions are exactly what the *Sindell* plaintiff alleged; neither she nor Tamraz allege that their respective defendants acted in concert to undertake any *positive* tortious activity, such as communicating to them assurances that the product would not cause harm.

In light of the undisputed facts of this case, and as a matter of California law, the motion for summary judgment on Tamraz's aiding and abetting claims and acting in concert claims must be granted.

## V.    Claim for Common Law Fraud.

At count three of his second amended complaint, Tamraz asserts a claim for common law fraud based on failure of disclosure.  Tamraz alleges the manufacturing defendants "committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and [necessary] precautionary measures."[17]  Tamraz further alleges that the defendant manufacturers: (1) "knew that [Tamraz] was ignorant of the fact and did not have an equal opportunity to discovery [sic] the truth about the dangers presented by [their] products," and (2) intended to induce [Tamraz] to . . . buy and use their products, by failing to disclose the known dangers of their products."[18]

---

[17]  Second amended complaint at ¶24; *see id.* at ¶101 (defendant manufacturers "failed to disclose and concealed material facts within their knowledge" regarding the dangers of welding rods).

[18]  *Id.* at ¶¶102-03.

Tamraz further explains this "fraud by nondisclosure" as follows: "Defendants made partial disclosures of facts regarding the safety of welding consumables, which were deceptive, and . . . failed to disclose and actively concealed important facts regarding the true dangers of welding consumables."  Response at 3.

California law is clear that there are "four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Limandri v. Judkins*, 52 Cal. App. 4th 326, 336 (Cal. Ct. App 1997).  Only the latter three circumstances could apply in this case, as Tamraz does not assert he had a fiduciary relationship with any defendant.  And each of these latter three circumstances "presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise." *Id.* at 336-37.  "[W]here material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts."  *Id.* at 337 (italics in original).

The *Limandri* court further explained this "relationship requirement," stating that, "[a]s a matter of common sense, such a relationship can only come into being as a result of some sort of transaction between the parties.  * * *  Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement. * * * All of these relationships are created by transactions between parties from which a duty to disclose facts material to the transaction arises under certain

18

circumstances." *Id.* (citations omitted).

In this case, defendants argue that, as a matter of law, Tamraz does not state a common law fraud claim because there was no relationship between Tamraz and any defendant that gave rise to a duty of disclosure.[19] Defendants note correctly that "the only relationship hinted at in [Tamraz's] complaint is one between product-user/product-manufacturer."  Motion at 7.  Indeed, in this case, there is not any evidence that Tamraz, himself, ever purchased welding rods directly from any manufacturing defendant; the welding products he used were provided to him by his employers.  In other cases where there existed only this type of "product-user/product-manufacturer" relationship between the plaintiff and the defendant, California courts have granted the defendant's motion for judgment as a matter of law on common law fraud claims.  For example, in *Zavala v. TK Holdings, Inc.*, 2004 WL 2903981 (Cal. Ct. App. Dec. 16, 2004), the plaintiffs were owners of a car equipped with allegedly defective seat belts.  Although the plaintiffs purchased their car, they never transacted directly with the seat belt manufacturer; nonetheless, they sued the seat belt manufacturer for common law fraud, alleging the manufacturer had "failed to disclose the dangerously defective condition of the seat belts."  *Id.* at *10.  The court found the plaintiffs failed to state a cause of action because there was no allegation that the plaintiffs had ever transacted directly with the defendant.  Importantly, however, the *Zavala* court also noted (twice) that the plaintiffs had *not* alleged that "nondisclosures were made [by the seat belt manufacturer to *others*] with the intent that [the

---

[19] Defendants moved for judgment on the pleadings on Tamraz's common law fraud claim; they did not move for summary judgment.

19

nondisclosures] be repeated to and acted upon by [plaintiffs]." *Id.*[20]

Defendants in this case argue that, like the seat belt manufacturer in *Zavala*, they never transacted directly with Tamraz, so they had no duty to disclose upon which a fraud claim can be premised. While this argument has some force, the Court must conclude that it is not convincing, for the simple reason that a California state court weighed the exact same argument in the exact same circumstances, and found it unavailing.

In its state-court analog to this federal MDL, California has aggregated its welding fume cases pursuant to California Judicial Council Coordination Proceeding No. 4368, presided over by Judge Bonnie Sabraw. In one of those cases, *King v. BOC Financial Corp.*, case no. RG-07344706 (Sup. Ct. Cal. Nov. 1 2007), Judge Sabraw recently discussed the *Limandri* case, quoted above. She then concluded as follows:

> There are triable issues of material fact whether Plaintiff can prevail on a claim under categories two (special relationship creates duty to disclose) and three (half-truth). There are triable issues of fact regarding what Defendants knew, and when, concerning the hazards associated with exposure to the manganese in welding fumes. . . . There are triable issues of fact regarding whether the defendants intentionally understated warnings or placed the warnings in locations where it was reasonably likely that the warnings would not serve their intended purpose. **The absence of transactions directly between Plaintiff and the manufacturing defendants does not eliminate the possibility of a valid fraud claim.** *Whiteley v. Philip Morris, Inc.* **(2004) 117 Cal. App. 4th 635, 680-681.**

Op. at 8 (emphasis added). The *Whiteley* case cited by Judge Sabraw, in turn, explains as follows:

---

[20] The *Zavala* court also stated: "Nor does the [complaint] plead indirect communication. Under that theory, the maker of a fraudulent misrepresentation is subject to liability to another who acts in justifiable reliance upon it, if it is made to a third person and the maker intends or has reason to expect that its terms will be repeated to the other, and that it will influence his conduct. The [complaint] does not allege that [the seat belt manufacturer's] representations were repeated to [plaintiffs], or that [plaintiffs] relied [on] the representations to their detriment." *Id.* at *10 (citation omitted).

Contrary to defendants' contention, Whitely [sic] did not have to prove that she saw or heard any specific misrepresentations of fact or false promises that defendants made or that she heard them directly from defendants or their agents. It was sufficient that the statements were issued to the public with the intent that they reach smokers and potential smokers and that Whiteley, as a member of the intended target population, heard them. The jury was correctly instructed: "One who makes a misrepresentation or false promise or conceals a material fact is subject to liability if he or she intends that the misrepresentation or false promise or concealment of a material fact will be passed on to another person and influence such person's conduct in the transaction involved." "A person has reason to expect that misrepresentation, false promise or nondisclosure of material fact will be passed on to another person and influence that person's conduct if he or she has information that would lead a reasonable person to conclude that there is a likelihood that it will reach such person and will influence his or her conduct in the transaction involved." "Subject to liability means that the defendant is liable if all of the other essential elements of the claim of fraud are established. [¶] One who makes a misrepresentation or false promise or conceals a material fact with the intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that category who is actually misled thereby."

*Whiteley*, 117 Cal. App. 4th at 680-81. Thus, Judge Sabraw rejected directly the same argument that defendants make here, and implicates the "indirect communication" theory that was absent in *Zavala*.

The material facts in *King* and in this case are precisely the same, as is the applicable law. That the California state court judge presiding over the Welding Fume Coordinated Proceedings considered and rejected precisely the same arguments made by the same defendants as in Tamraz's case – which is also governed by California law – is highly persuasive.[21] Accordingly, this Court must deny defendants' motion for summary judgment on Tamraz's common law fraud claim.

_____

[21] While one could conceive of grounds upon which to distinguish the facts in *Whiteley* from those here and in *King*, this Court's role is not to make new California law, it is to try and divine it where unclear. Judge Sabraw has compared the cases and finds them sufficiently similar to justify application of the same legal principles. Given Judge Sabraw's familiarity with California law, this Court defers to her conclusion.

**VI.**     **Claim for Negligent Performance of a Voluntary Undertaking.**

At count ten of his second amended complaint, Tamraz asserts a claim for the negligent performance of a voluntary undertaking.  The Court earlier discussed the same claim in detail in *Solis v. Lincoln Elec. Co.*, 2006 WL 1305068 at *4-7 (N.D. Ohio May 10, 2006), and granted summary judgment in favor of defendants.

Tamraz makes no arguments in addition to or different from those made in *Solis*.  Indeed, Tamraz forthrightly states that the response brief he files is the same as the one that *Solis* filed.  The substantive law applicable in this case is no different than in *Solis*, nor are the material, undisputed facts.  Accordingly, for all the reasons stated in *Solis*, the defendants' motion for summary judgment on Tamraz's claim for negligent performance of a voluntary undertaking is granted.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley

**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: November 13, 2007