04cv18948c(motion4mistrial).wpd

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JEFFREY TAMRAZ, et al.,** : | |
| : | **Case No. 1:04-CV-18948** |
| **Plaintiffs,** : | |
| : | **JUDGE O'MALLEY** |
| v. : | |
| : | **MEMORANDUM AND ORDER** |
| **LINCOLN ELECTRIC CO., et al.,** : | |
| : | |
| **Defendants** : | |

Defendants move for a mistrial in this action (docket no. 162). For the reasons stated below, this motion is **DENIED**.

**I.  Facts.**

The trial of this matter began on November 5, 2007, and the nine-member jury began its deliberations on November 21, 2007. On November 21, 27, and 28, during their deliberations (which continue as of the date and time of this writing), the jury sent to the Court three written notes. In each instance, the Court followed its standard procedure of giving a copy of the note to the parties, conferring with counsel regarding the appropriate response, and then providing a response to the jury in writing. Further, in each instance, the communication between the Court and the jury occurred as follows: (1) the jury's note was received from the jury foreman by the Court's deputy clerk; and (2) David Cohen, the Court-appointed Special Master, who has assisted the undersigned throughout these MDL proceedings and

attended the entire trial, conveyed the Court's written response back to the jury foreman.[1]

On the morning of November 29, 2007 – the fifth day of deliberations[2] – the jury again sent a written note to the Court, again delivering it to the deputy clerk. This note stated: "After much deliberation and several votes, we are at a deadlock. What do we do now?" The Special Master contacted the undersigned, who was driving to the Courthouse, returning from the airport. The undersigned directed the Special Master to summon the parties to the courtroom, wait 15 minutes, and then tell the jury foreman that: (1) the Court had asked the attorneys to return to the courtroom, (2) it would take a while for everybody to reconvene, (3) the Court would address the jury in the courtroom in due course, and (4) the jury should be prepared to answer the question of whether it believed further deliberations could still be productive.

When the Special Master went to deliver this message to the jury, however, which was about 20-25 minutes after the deputy clerk had first received the jury's note, the jury foreman reported that "things were moving," suggesting the jury was no longer deadlocked. The Special Master asked whether the foreman believed the jury still needed instruction from the Court to obtain an answer to the question "what do we do now?" The foreman responded "no," saying that "just sending the note" had caused the jurors to start further discussions. Thus, the Special Master never delivered to the jury the above-described message.

When counsel for the parties arrived, the Court met with them in chambers and described this sequence of events. The Court further informed counsel that it did not intend to inquire further of the jury,

---

[1] The same procedure occurred again with a fifth jury note on November 30, 2007. The procedure in connection with the fourth jury note is described immediately below.

[2] The jury began their deliberations on the day before the Thanksgiving holiday, and did not deliberate a full day.

2

absent receipt from the foreman of further communication.[3] The parties did not object to the Court's decision.

The jury continued to deliberate for the rest of the day, leaving at about 4:00 p.m. As defendants note, "as the jury departed, Special Master Cohen orally reported to counsel that the jury was 'making progress.'" Motion at 2. The Special Master's observation was prompted by the fact that, late in the afternoon, the jury foreman had signaled the Court's deputy clerk, Christine Huth, to tell her the jury was leaving for the evening. As Ms. Huth left the jury room, the jury foreman made an unsolicited statement to her: "we're making great strides." Ms. Huth did not respond, but did report this comment to the Court and to the Special Master, who later disclosed to counsel what the jury had volunteered – that is, that the jury was "making progress." No communication between the Special Master and the jury occurred at that point in time.

## II.   Analysis.

Yesterday – which is four and a half days after the above-described events occurred, and after at least two more days of jury deliberations – defendants filed their motion for mistrial on the grounds that the Court engaged in improper conduct on November 29, 2007. Defendants seek an expedited ruling on their motion, asking that a mistrial be declared before the jury is able to return a verdict. Based on the questions posed by the jury and the length of their deliberations, the defendants now seem to suspect the

---

[3] While the defendants describe the sequence of events differently in their motion, their description is inconsistent with what actually occurred and with what the Court told them, as well as from the generally-more-accurate description contained in plaintiffs' response brief. The Court assumes that the defendants' mis-characterization of what the Court told them is accidental – more likely prompted by a mis-communication between those present in chambers and those charged with drafting the current motion, than by an effort to skew the facts of this case to resemble more closely the cases cited in the motion.

3

verdict may be something other than a complete defense verdict.

The defendants characterize the Special Master's morning interaction with the jury, after the foreman had reported a deadlock, as an improper, *ex parte*, off-the record communication. The defendants suggest that the Special Master, himself, actually asked the jurors "whether there was any possibility that they might overcome their differences." Motion at 2. Defendants go so far as to argue that "the Special Master's [morning] conversation with the jury effectively served as an off-the-record, *ex parte Allen* charge." *Id.* at 4 (referring to *Allen v. United States*, 164 U.S. 492 (1896)). Defendants then suggest that the Special Master has an unspecified afternoon discussion with the jury, where he learned that, during the several hours between their morning note and their decision to break for the day, the jury had "made progress." Defendants assert that these contacts constitute egregious judicial misconduct and warrant a mistrial in this complex and lengthy matter. The defendants are wrong, both factually and legally.

The defendants cite case law standing for the proposition that "[e]x parte contact between judge and jury raises a presumption of reversible error." *Standard Alliance Inds., Inc. v. Black Clawson Co.*, 587 F.2d 813, 828 (6th Cir. 1978), *cert. denied*, 441 U.S. 923 (1979) (citing *Petrycki v. Youngstown & Northern Ry. Co.*, 531 F.2d 1363, 1367 (6th Cir. 1976), *cert. denied*, 429 U.S. 860 (1976)). Of course, this general prohibition against judicial communication with a jury outside of the open courtroom extends to the judge's staff, and those acting in a quasi-judicial role. *See, e.g.*, *id.* at 828 (after counsel for plaintiff spoke with two jurors who had delivered a liability verdict in favor of the plaintiff, and who still had to deliberate on damages, the court sent a law clerk to interview the jurors, thereby compounding any problem by creating ex parte, unrecorded communications between the court and the jury); *Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980) (in a trial to the bench, the court sent a law clerk to view the defendant's machine at the plaintiff's manufacturing plant; the appellate court reversed

4

the judgment for the plaintiff, noting that "a judge may not direct his law clerk to do that which is prohibited by the judge"); *Alejo Jiminez v. Heyliger*, 792 F. Supp. 910 (D. P.R. 1992) (granting a motion for mistrial after a court security officer interfered with jury deliberations).  Thus, it is equally true that ex parte contact between the Court-appointed Special Master and the jury can produce reversible error.

Unsurprisingly, however, the case law reveals that ex parte communications between the Court and its staff can provide a basis for mistrial only in circumstances far different than those the defendants point to here.  All five of the cases cited by defendants in their motion bear this out.  In *Standard Alliance*, "the district court, without notice to either party, sent his law clerk to interview [two] jurors."  587 F.2d at 828.  Although "the length and nature of the law clerk's contact with the jury was unknown [because] [n]o record was kept [and] no notice was given to the parties," the interaction between the jurors and the court was obviously both substantive and substantial.  *Id.* at 828-29.  In *Price Brothers*, the court "sen[t] a law clerk to gather evidence."  629 F.2d at 446.  This act was completely "destructive of the appearance of impartiality required of a presiding judge."  *Id.* (noting also that "not every ex parte communication to the trial court requires reversal").  In *Jiminez*, a new trial was granted after the court learned that a security officer ("CSO") had "entered the jury room and stayed there during their deliberations."  792 F. Supp. at 912.  Not only that, but the CSO responded to the jury's request for "the two charts made by the experts of each party" by delivering only the chart created by the defendant's expert, and not the plaintiff's.  *Id.* at 913.  In *People v. Bradford*, 154 Cal. App. 4th 1390 (Cal. Ct. App. 2007), the judge repeatedly entered the jury room and discussed the case with the jury during their deliberations, sometimes delivering corrections to the erroneous instructions he had delivered during his last visit.  And, in *United States v. Maraj*, 947 F.2d 520 (1st Cir. 1991), even though the judge in a criminal case did not disclose to counsel "the last sentence in [a] jury's note," the appellate court *affirmed the conviction*, finding that the district

5

court's action, "to the extent erroneous, [was] entirely harmless." *Id.* at 526, 522. The circumstances described in all five of these cases cited by defendants are dramatically different from those in this case.

In fact, even the *Bradford* court acknowledged that not "every intrusion into the jury's deliberative process requires automatic reversal." 154 Cal. App. 4th 1417 (citing cases). Rather, under California law (which applies in this case), "unauthorized ex parte communications with the jury need not result in reversal if the improper contact was harmless beyond a reasonable doubt." *People v. Jennings*, 53 Cal.3d 334, 383-84 (Cal. 1991), *cert. denied*, 502 U.S. 969 (1991) (adopting the standard set out in *Chapman v. California*, 386 U.S. 18, 24 (1967)). As the Sixth Circuit Court of Appeals has explained, "a court's ex parte communication with the jury will not require reversal where substantive rights of parties have not been adversely affected." *Petrycki*, 521 F.2d at 1367.

Thus, federal appellate courts have repeatedly found no meaningful error in civil cases where there were ex parte, unrecorded communications between the court and the jury far more lengthy and substantive than the ones at issue here. For example, in *Dixon v. Southern Pac. Transp. Co.*, 579 F.2d 511, 513 (9th Cir. 1978), the appellate court affirmed a jury verdict even though the magistrate judge had answered a jury's question about how comparative negligence worked by giving additional instruction "off the record and without notice to counsel." In *Acree v. Minolta Corp.*, 748 F.2d 1382 (10th Cir. 1984), the judge responded in writing to two jury notes about specific points of evidence and damages, without first notifying counsel. The *Acree* court noted "it is not error if the instructions given to the jury are merely administrative decisions rather than supplementary instructions," such as "what the law is or . . . how to apply the law to the evidence," and concluded that any error was harmless. *Id.* at 1385-86. In *Skill v. Martinez*, 677 F.2d 368 (3rd Cir. 1982), the jury's note asked about a specific evidentiary question, and the judge supplied a substantive response after consulting only with plaintiff's counsel. The court found any

6

error harmless and affirmed the plaintiff's verdict, holding that "a trial court's unrecorded ex parte communication with the jury after it has begun its deliberations is subject to the provisions of Fed. R. Civ. P. 61, which requires the court to 'disregard any error or defect in the proceeding which does not affect the substantive rights of the parties.'"  *Id.* at 371.

Indeed, courts have even examined claims of *constitutional violation* and affirmed criminal convictions in cases where ex parte communication between court and jury was more substantive than is the case here.  For example, in *Tate v. Morris*, 1990 WL 117367 (6th Cir. Aug. 14, 1990), *cert. denied*, 499 U.S. 963 (1991), the court undertook habeas review of a conviction where the judge had received a jury note indicating deadlock, and then delivered instructions to continue deliberating – all without telling counsel.  The *Tate* court characterized the judge's actions as "innocuous" and "non-coercive," noted that "the judge did not address any fact in controversy nor any law applicable to the case," stated "[t]here was no substantive communication," and found any error harmless.  *Id.* at *4-5.  *See also Young v. Herring*, 938 F.2d 543, 558 n.7 (5th Cir. 1991), *cert. denied*, 503 U.S. 940 (1992) (denying habeas relief after judge instructed bailiff to tell deadlocked jury, ex parte and off the record, to keep deliberating; rejecting the assertion that there was a "presumption of prejudice"); *United States v. Nosov*, 221 F. Supp.2d 445 (S.D.N.Y. 2002), *affirmed*, 2004 WL 2998700 (2nd Cir. Dec. 28, 2004), *cert. denied*, 546 U.S. 903 (2005) (denying a motion for new trial after the court met several times with jurors, ex parte and without notice, to settle personality conflicts between them); *United States v. DiPietto*, 396 F.2d 283, 287 (7th Cir. 1968), *cert. granted in part, judgment vacated in part sub nom Giordano v. United States*, 394 U.S. 310 (1969) (affirming a conviction even though the trial judge directed a deputy marshal to tell the deadlocked jury, off the record and ex parte, to "continue deliberating"); *United States v. Balderas*, 1994 WL 144449 at *4 (6th Cir. Apr. 21, 1994) (affirming the denial of a motion for new trial "based on the ex parte

7

communication from the juror to the court, via the law clerk" about another juror's drug use); *United States v. Paul*, 2003 WL 173059 at *6 (6th Cir. Jan. 23, 2003) (affirming a conviction despite the judge's ex parte communications with the jury regarding "the general well-being of the jurors, the way in which the lawyers were handling the exhibits, and the fact that the lawyer for the United States Attorney's office was speaking too softly, making it difficult for the jurors to hear him"). It is beyond argument that the communications the Special Master had with the jury in this civil case are far more innocuous than those identified in any of these criminal cases.

As the Supreme Court has noted, "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Rushen v. Spain*, 464 U.S. 114, 118 (1983).[4] In this case, the Special Master *intended* to tell the jury – ex parte and off the record – about scheduling matters and about what the Court would ask the foreman when the jury met with counsel and the undersigned in open court. The Special Master had no authority to seek, and would not have sought, any response from the jury on these directives. Even if the Special Master had, in fact, told the jury about what they could expect to occur, these points are clearly innocuous and administrative in nature – they in no way addressed any fact

---

[4] The *Rushen* court continued: "The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice." *Id.*

8

in controversy, nor any law applicable to the case, nor did they have any potential to be coercive.[5]

Even more important, however, is that the Special Master simply did not do what defendants assert. The first ex parte communication identified by defendants was abbreviated when the jury foreman stated, in essence, that the deadlock had loosened; the Special Master never conveyed the message he was originally directed to deliver. The second ex parte communication identified by defendants is pure fiction.

In sum, the defendants have speculated incorrectly regarding communications between the jury and the Court. Such speculation is both inaccurate and legally insignificant. Worse, the speculation is offered by defense attorneys who were not even present in the courthouse during *any* of the events at issue, much less present in chambers during the Court's explanation of what transpired.[6] Declaration of a mistrial is one of the most "drastic" alternatives available to a trial court, a remedy of "last resort." *Illinois v. Somerville*, 410 U.S. 458, 469 (1973); *Hatfield-Bermudez v. Aldanondo-Rivera*, 496 F.3d 51, 64 (1st Cir. 2007). Counsel asking for so extreme a remedy have an obligation to ensure the accuracy of the facts upon

---

[5] The fact that the jury continues to deliberate many days after the communications in question shows that the communications bore no coercive effect. *See Nosov*, 221 F. Supp.2d at 456 ("given the length of the jury's deliberations after the ex parte meetings – in this case almost two full days – no basis for court coercion has been made"); *Tate*, 1990 WL 117367 at *4 (given that the jury deliberated "for a full two hours after the judge's [ex parte] instruction," there was no coercion). Further, the Sixth Circuit Court of Appeals has rejected the contention that statements like the one the Special Master *intended* to make to the jury (that is, "Please be prepared to answer in Court the question of whether you believe further deliberations could still be productive") constitute an *Allen* charge. *Tate*, 1990 WL 117367 at *4.

[6] Defense counsel indicated the motion was not drafted by actual trial counsel, and that it was not trial counsel who would argue the motion if argument was permitted. This compartmentalized approach by defendants has occurred throughout these proceedings, and this is not the first time it has led to confusion, misunderstanding, and misstatement by defense counsel. Indeed, trial counsel in this matter repeatedly and blatantly violated this Court's in limine rulings during trial, but claimed to have done so innocently because he neither participated in the briefing for, nor hearings on, those matters, and claimed not to have been accurately informed of the Court's rulings on them. Similarly, trial counsel often responded to objections by mis-characterizing earlier oral, in-court rulings delivered when they were not present.

9

which they base their request, and not to accuse blithely the Court of improper conduct.[7]

The motion for mistrial is baseless, and is denied.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**DATED**: December 4, 2007

---

[7] In their reply brief, defendants go so far as to argue that the Court somehow has the burden to *prove* that it has not, through the Special Master or otherwise, actually participated actively in the jury's deliberations. Defendants imply they have the right to assume that the Court held lengthy, undisclosed conversations with the jury because there is no record to the contrary – that is, they obtain the benefit of an non-rebuttable presumption because the Court cannot somehow prove a negative. Given the history of this litigation, the undersigned's careful and regimented trial practices over the years, and a careful reading of the law upon which defendants purport to impose this burden on the Court, such baseless and, indeed, disrespectful argument merits little response. The Court notes merely that, to the extent any "presumption" of prejudice exists in this context, it arises only once the fact of egregious misconduct or jury intrusion has been first established. *Young*, 938 F.2d at 558 n.7 (noting that "the Supreme Court clarified in *Smith v. Phillips*, 455 U.S. 209 (1982)," that it found a "presumption of prejudice" in *Remmer* because of "the seriousness of the contact" with the jury). It does not arise, as defendants assert, from their own accusations.